UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,          Case Number 17-20790
                    Honorable David M. Lawson
v.

ROBERT A. GROSS,

    Defendant,

In re: B&W REAL PROPERTY ASSOCIATES, L.L.C.  Case Number 18-50728

In re: TITAN FUNDING, LLC          Case Number 18-50729

In re: NENA AND MARK DOWNING       Case Number 18-50827

In re: HOWARD AND KAREN SHERLINE     Case Number 18-50844

    Moving Parties.
_____/

**OPINION AND ORDER DENYING MOTIONS BY TITAN FUNDING, NENA
AND MARK DOWNING, AND HOWARD AND KAREN SHERLINE
FOR RECOGNITION AS CRIME VICTIMS, AND GRANTING MOTION BY
B&W REAL PRPOPERTY FOR VICTIM STATUS AND RESTITUTION**

On December 7, 2017, Robert Gross, an attorney, pleaded guilty to and was convicted of one count of wire fraud. The government (and Gross) identified several victims of Gross's fraud. Another individual, Alec Lang, filed a motion to be recognized as a victim, which the Court denied. *United States v. Gross*, No. 18-50368, 2018 WL 1804691 (E.D. Mich. Apr. 17, 2018). The court of appeals likewise denied relief. *In re Alec Lang*, No. 18-1459 (6th Cir. Apr. 26, 2018). Before the Court are four more motions filed by various parties for recognition of crime victim status and awards of restitution from Gross under the Crime Victims' Rights Act (CVRA). The movants are: (1) B&W Real Property Associates, LLC (No. 18-50728); (2) Titan Funding, LLC and Titan

Loan Servicing, LLC (No. 18-50729); (3) Nena and Mark Downing (No. 18-50827); and (4) Howard and Karen Sherline (No. 18-50844). Like Lang, the Downings, Sherlines, and B&W have not established that they were victims of the crime Gross was convicted of in this case. Their motions will be denied. Because B&W has made the requisite showing, its motion will be granted.

I.

A. Gross's Crime

Gross entered a plea of guilty to a single count of wire fraud under 18 U.S.C. § 1343. Gross pleaded guilty under a Rule 11 agreement, which included a recitation of the factual basis for the conviction. Rule 11 Agreement [R. 9] (Pg ID 17-22). According to that recitation, between 2013 and 2016 Gross engaged in a scheme to procure fraudulent loans for the benefit of two associates named by the government only as "Person A" and "Person B." Those pseudonyms, it appears, were intended to refer to William Gonte and Brian Benderoff.

"In his plea agreement Gross admitted to fraudulent representations in connection with: an August 2013 loan; a March 2016 condominium conveyance; a March 2016 transfer of interest in a life insurance policy; a June 2016 loan to be used to pay off equipment liens; and a June 2016 investment in a medical marijuana business." *In re Alec Lang*, No. 18-1459, slip op. at 3 (6th Cir. Apr. 26, 2018). *First*, in August 2013, Gross brokered a loan by victim S.G. to parties referred to by the government only as "Person A" and "Person B." Gross told S.G. that the loan would be "fully secured" and that it would be repaid "in a matter of days." When the loan was not repaid, Gross told S.G. that more funds would need to be loaned to preserve the investment, or the original

funds would be lost. Gross secured a series of loans from S.G. by similar representations over several years, eventually amounting to more than $2.6 million.

*Second*, in March 2016, Person A and Person B sought a loan from another (unidentified) creditor. They wanted to offer a particular condominium unit as collateral for the loan, but the unit was not owned by either Person A or Person B. Gross drafted a quit claim deed that purported to transfer the condominium from victim G.G. to Person B, and Person B forged G.G.'s signature on the deed. Gross then fraudulently notarized the deed, certifying that it was signed by G.G. Person A and Person B then obtained the loan using the forged deed.

*Third*, again in March 2016, Person A and Person B sought to obtain yet another loan from another (unnamed) creditor. Person A wanted to offer a life insurance policy as collateral for the loan, but he was not allowed to do so without the written consent of victim S.G., who held an interest in the policy. Gross drafted a document purporting to transfer Person A's interest in the policy with the consent of S.G. Person B forged S.G.'s signature on the document, and Gross fraudulently notarized the signature, attesting that S.G. had signed it. Person A and Person B then obtained the loan using the life insurance policy as collateral.

*Fourth*, in June 2016, during a trip to Las Vegas, Gross told another of his clients, D.A., that funds loaned by D.A. would be used to invest in a medical marijuana business, although he knew that the funds would not be invested in any such business. D.A. advanced $125,000 in funds through Gross, which Person B then used to secure a gambling marker (a credit line extended by a casino for a customer to use for gambling). During the same trip, Gross told his client E.H. that funds he loaned would be used to pay off equipment liens that would allow for the sale of a

business and return of the funds. E.H. advanced $125,000 through Gross, which Person B then used to obtain a gambling marker at the Caesar's Palace casino.

Robert Gross pleaded guilty in the underlying criminal case on December 7, 2017. After the Court heard from the various parties seeking victim status and restitution, Gross was sentenced on June 26, 2018. The judgment was entered on June 28, 2018, and it reserved the determination of the specific amount of restitution for later adjudication.

### B. Applicable Law

As in Lang's case, these motions present two questions: whether the various movants are "victims" under the statutory definition; and whether they have established that they suffered loss entitling them to restitution.

#### 1. Crime Victim

"A 'crime victim' is defined under the [Crime Victims' Rights Act (CVRA)] as a person 'directly and proximately harmed as a result of the commission of a Federal offense or an offense in the District of Columbia.'" *In re McNulty*, 597 F.3d 344, 349 (6th Cir. 2010) (quoting 18 U.S.C. § 3771(e)). "The requirement that the victim be 'directly and proximately harmed' encompasses the traditional 'but for' and proximate cause analyses." *Id.* at 350 (citations and quotations omitted). The concept of "direct harm" encompasses a "but-for" causation notion that is different from that of "proximate harm," and for both purposes the necessary inquiry is fact-specific. *Ibid.* "The CVRA 'instructs the district court to look at the offense itself only to determine the harmful effects the offense has on parties. Under the plain language of the statute, a party may qualify as a victim, even though it may not have been the target of the crime, as long as it suffers harm as a result of the crime's commission.'" *Id.* at 351 (quoting *In re Stewart*, 552

F.3d 1285, 1289 (11th Cir. 2008)). "Thus . . . the issue becomes whether [the petitioner] was directly and proximately harmed by criminal conduct in the course of the [crime] or if the actions taken by [the] defendant[] in the underlying case which allegedly harmed [the petitioner] were merely ancillary to the [crime]." *Ibid.* "In making this determination, [the Court] must (1) look to the offense of conviction, based solely on facts reflected in the jury verdict or admitted by the defendant; and then (2) determine, based on those facts, whether any person or persons were 'directly and proximately harmed as a result of the commission of [that] Federal offense.'" *Ibid.* (quoting *United States v. Atlantic States Cast Iron Pipe Co.*, 612 F. Supp. 2d 453, 536 (D.N.J. 2009) (collecting cases)).

2. Restitution

When considering restitution for victims in a fraud case, "a victim's losses may only be included in a restitution award arising from fraud if the victim actually relied on the perpetrator's fraudulent conduct or misrepresentations." *United States v. Teadt*, 653 F. App'x 421, 429 (6th Cir. 2016). Reliance may be established either by "direct evidence that each individual investor [received] the false information and relied on it when deciding to [invest]," or, where the scope of the fraud scheme makes "requiring individualized proof of reliance for each investor . . . infeasible or impossible," then "the government may instead offer specific circumstantial evidence from which the district court may reasonably conclude that all of the investors relied on the defendant's fraudulent information." *United States v. Stein*, 846 F.3d 1135, 1153-54 (11th Cir. 2017) (considering calculation of the loss amount under U.S.S.G. § 2B1.1). "In some cases, it will be clear that no reasonable person would have given the defendant her money if she had known of his plan — as in the fraud in [*United States v. Ojeikere*, 545 F.3d 220, 223 (2d Cir. 2008),] where

the defendant's plan was to abscond with his co-conspirators' funds as soon as he got hold of their money," and "[i]n those cases, a generalized description of the fraudulent scheme is enough to support restitution." *United States v. Archer*, 671 F.3d 149, 172 (2d Cir. 2011). "But where it is plausible that some individuals would have paid the defendant even if they had been informed of his fraudulent plan, then the government must proffer some individualized evidence to meet its burden of showing that each alleged 'victim' was actually a victim." *Ibid.*

## II. B&W Real Property Associates, L.L.C.

B&W Real Property Associates, LLC is a commercial lending firm in Southfield, Michigan. In March 2016, William Gonte and Brian Benderoff (Persons A and B identified in the plea agreement), met with Jack Wolfe, a loan consultant for B&W, and solicited a loan secured by a lien on a home owned by Gonte's parents. Because the home was titled in the name of Gary Gonte — apparently William Gonte's father — the property could not be mortgaged without a quit claim deed executed by Gary Gonte. Wolfe spoke to Gary Gonte about the need for him to convey the property to William Gonte so the loan could be obtained, and Gary Gonte agreed to the conveyance. Wolfe understood that Gross "would obtain Gary Gonte's notarized signature on the deed," and a quit claim deed subsequently was prepared and notarized by Gross. This was the same conveyance of a condominium unit owned by "G.G." that was recited in the plea agreement. B&W issued a loan for $136,500 secured by a lien on the condominium. Some payments were made on the loan, but B&W asserts that it still is owed a large outstanding balance. B&W also represents in its motion that the property presently is the subject of a quiet title action in the Oakland County, Michigan circuit court, as a result of the defective conveyance.

B&W argues that it is entitled to participate in the sentencing as a victim and should be awarded restitution because (1) it is the unnamed lender involved in the March 2016 loan secured by a condominium unit, which is recited as a partial basis of the wire fraud conviction in the Rule 11 plea agreement; and (2) it has been directly and proximately harmed as a result of the injury to its lien interest caused by the fraudulent conveyance, which has led to litigation that could result in the failure of its collateral and inability to recover on the secured loan.

The government concedes that B&W is the unnamed lender that issued a loan secured by the condominium unit, on the basis of the fraudulent quit claim deed. However, the government asserts that during the investigation Gross took the position that B&W's loan consultant, Jack Wolfe, who brokered the deal for the loan secured by G.G.'s condominium, knew that the deed was fraudulent, but proceeded to close the deal anyway. The government asserts that it did not name B&W as a victim in the plea agreement because it did not think that it could prove by a preponderance of the evidence that Wolfe did not know that the deed was fraudulent.

Based on the record before the Court, however, B&W adequately has established that it is a "victim" of the fraud involved in the offense of conviction to which Gross pleaded guilty. At least the following facts are undisputed, according to the record presently before the Court: (1) in March 2016, defendant Gross prepared and notarized a fraudulent quit claim deed purporting to convey a condominium unit from Gary Gonte ("GG") to William Gonte; (2) William Gonte and another person used that fraudulent deed to obtain a loan from movant B&W, using the condominium as collateral, with William Gonte's interest evidenced by the fraudulent deed; (3) although some payments were made on the loan, it has not been repaid in full; and (4) the property presently is the subject of a quiet title action wherein Gary Gonte has sued Wolfe, Gonte, B&W,

and Gross, through which he seeks to recover clear title to the property, alleging that he never executed the deed in question. The government questions the veracity of affiant Wolfe, the broker who brought the loan deal to B&W, perhaps with good reason. *See Aleynu, Inc. v. Universal Prop. Dev. & Acquisition Corp.*, 564 F. Supp. 2d 751, 757 (E.D. Mich. 2008); *Karate Inst., Inc. v. Jack B. Wolfe*, No. 06-14783, 2007 WL 2332464, at *1 (E.D. Mich. Aug. 15, 2007). But its position that Wolfe knew that the quit claim deed was fraudulent is not supported by any admission by the defendant in the Rule 11 plea agreement, or by any other evidence offered by any party.

Moreover, regardless of whether Wolfe knew about the fraudulent deed, there is no suggestion in the record that B&W was informed of the fraud when it issued the loan. Therefore, B&W adequately has established that it was harmed as a direct result of reliance on the fraudulent representation described in the plea agreement, and it is entitled to be regarded as a victim. For the purposes of awarding restitution, "a victim's losses may . . . be included in a restitution award arising from fraud if the victim actually relied on the perpetrator's fraudulent conduct or misrepresentations." *Teadt*, 653 F. App'x at 429. B&W also has shown that it is entitled to an award of restitution, since it is undisputed that the representation that it says it relied upon was the same representation admitted in the plea agreement. Therefore, restitution could be ordered.

However, B&W has not submitted any information establishing the amount of their loss. It has asserted only that it made a loan of $136,500, that some payments have been made, and that an unstated balance remains owing. Because B&W has not submitted any information on the amount of its loss, restitution cannot be ordered at this time. B&W may supplement its presentation if it chooses, but it must do so promptly.

III. Titan Funding, LLC

Titan Funding, LLC and Titan Loan Servicing, LLC are commercial lenders from Florida. In March 2016, Gross met with Jack Wolfe, Titan's loan consultant, about a loan deal in which Brian Benderoff (Person B named in the plea agreement) offered to assign his ownership interest in a company that owned an insurance policy in exchange for a $244,000 loan from Titan. Titan required that William Gonte (Person A) and Benderoff (Person B) guarantee the transaction. During a meeting between Gross, Gonte, Benderoff, and Wolfe, Gross represented that Benderoff had a 36% interest in Sherline Family Holdings, LLC, which was an entity that was entitled to $2 million in proceeds from a viatical investment in an insurance policy on the elderly Howard Sherline. The other owners of the LLC were Sheldon Gonte (a.k.a. "victim S.G.") with a 36% ownership stake, and Howard Sherline, with 28%. The viatical insurance investment was the only asset of the LLC entity. Benderoff's interest was valued at $720,000.

Wolfe received a letter from the attorney who set up the LLC opining that in order for Benderoff to assign his interest, he only would need the consent of one of the other two members, because the resulting sum of the shares would constitute a majority of the voting interests. Gross subsequently drafted an assignment purportedly endorsed by S.G. and notarized by Gross. This is the same assignment of the LLC interest and life insurance policy referred to in the Rule 11 plea agreement, which Gross admitted was fraudulent. Titan subsequently made a loan based on the fraudulent assignment of interest. Titan's motion also vaguely alludes to an "alleged fraud and conspiracy" by Gross, Gonte, and Benderoff, which it contends is "the subject of a state court lawsuit" by Titan against Gonte, Gross, and Benderoff in the Oakland County, Michigan circuit court. However, the motion does not state any facts suggesting that Titan suffered any actual loss stemming from the specific loan transaction described in the Rule 11 agreement. Moreover, in

his affidavit in support of the motion, Wolfe attested only that (1) a loan was made by Titan based on the purported assignment; (2) as of January 2018, the loan was current, and (3) to Wolfe's knowledge all required payments had been made on time. *In re Gross*, No. 18-50729, Mot. by Titan Funding, LLC [3], Ex. A, Jack B. Wolfe aff. ¶¶ 27, 30 (Pg ID 28).

Titan argues that, "[b]ut for Gross' alleged fraudulent actions, the alleged forged Assignment would not exist, and Titan would not have gone forward with the Transaction; therefore, Titan's damages are a direct and proximate result of Gross' alleged fraud and illegal actions." However, nowhere does anyone identify what damages Titan actually has suffered, if any. It contends, nevertheless, that it is entitled to an award of $244,000 in restitution, and that it also should be afforded all the privileges of a victim during the sentencing proceeding.

The government concedes that the Titan transaction is the same transaction that is described in the Rule 11 plea agreement involving an assignment of an LLC interest and a life insurance policy and the purported consent of victim S.G. However, the government asserts that Gross took the position during the investigation that Wolfe knew that the assignment was fraudulent. The government also offered as an exhibit to its motion a handwritten "indemnification agreement" signed by William Gonte and Brian Benderoff in which they agreed to indemnify Titan Funding against any claims by S.G. that his endorsement of the assignment was not genuine. The government contends that this agreement strongly suggests that Titan Funding knew that the purported assignment was fraudulent, and thus sought to absolve itself of any consequences of the fraud by obtaining indemnification from the principal perpetrators.

Titan Funding has not offered any evidence or information to show, or even to suggest, that it was harmed by the specific misrepresentation in the course of the loan transaction described

in the Rule 11 plea agreement. It is undisputed that the assignment and loan transaction referenced by Titan in its motion are the same as the March 2016 transaction described in the plea agreement involving victim S.G. But to qualify as a victim under the MVRA, Titan must show that it is was "'directly and proximately *harmed* as a result of the commission of a Federal offense or an offense in the District of Columbia.'" *McNulty*, 597 F.3d at 349 (quoting 18 U.S.C. § 3771(e)) (emphasis added).

Titan vaguely alludes to a fraudulent "scheme" and "conspiracy," which it contends is the subject of a civil action against Gross, Gonte, Benderoff, and Wolfe in state court. But it conspicuously does *not* assert, and it has not offered any information to show, that it has suffered any actual harm as a result of the loan transaction at issue here. It does not represent that the loan is delinquent or never was repaid, and it does not state that this specific loan or any proceeds of it are the subject of any claims in the state court action. Whether Titan relied on any representation by Gross or not, it has not established that it suffered any harm stemming from any such reliance, and it therefore does not qualify as a "victim" of Gross's fraud. Similarly, for the purposes of awarding restitution, "a victim's *losses* may only be included in a restitution award arising from fraud if the victim actually relied on the perpetrator's fraudulent conduct or misrepresentations." *Teadt*, 653 F. App'x at 429 (emphasis added). In this case, Titan has not established, or even suggested, that it suffered any loss that could be repaired by restitution.

Titan's motion will be denied.

IV. Nena and Mark Downing

Movants Nena and Mark Downing assert in their motion that they employed Gross as their attorney in various legal matters over many years. In May 2016, Gross solicited Mark Downing to put some money into a real estate investment that Gross was "facilitating" for an investor, whom he identified as another legal client. Gross told Downing that he could expect a 10-to-20% return on an investment of $150,000 within a few weeks, and that in the "worst case," even if the investment failed he would receive all of his money back but would not get any interest. Gross refused to disclose any more details about the deal, purportedly due to concerns about client confidentiality, but he assured the Downings that he had brokered similar deals with this investor in the past and found him to be reliable and trustworthy. On May 9, 2016, at Gross's direction, Nena Downing wired $75,000 to the account of an unnamed person (the movants refer in their motion to the recipient of the funds as "Person A"; at oral argument they clarified that they intended that reference to mean Brian Benderoff, one of the persons named by that pseudonym in the Rule 11 agreement). On May 17, 2016, in response to a further solicitation by Gross, the Downings wired another $50,000 to the account of "Person A." The movants assert that Nena Downing was interviewed by the government about the investment deal during the the investigation, but Mark Downing was not. The Downings do not assert that their investment deal was part of any of the four specific transactions described in the plea agreement, but they contend that they were victims of "the three-year-long, underlying scheme to defraud" that is "broadly define[d]" in the preamble of the plea agreement.

The Downings have not offered any information to show that they are "victims" of any of the specific acts of fraud to which Gross admitted in the Rule 11 plea agreement. For the purposes of awarding restitution, "a victim's losses may only be included in a restitution award arising from

fraud if the victim actually relied on the perpetrator's fraudulent conduct or misrepresentations." *Teadt*, 653 F. App'x at 429. Here, the Downings do not assert that they relied on any of the specific fraudulent representations described in the plea agreement. Instead, they merely contend that they were victims of a generalized scheme of fraud involving other, entirely separate representations that had nothing to do with the crimes of conviction. Those sorts of generalized assertions based on uncharged conduct unrelated to the crime of conviction do not suffice to qualify the movants as victims or to establish their entitlement to any restitution. *In re Alec Lang*, No. 18-1459, slip op. at 3 (6th Cir. Apr. 26, 2018) ("Lang alleges that Gross fraudulently induced him to: make loans to support a viatical settlement investment scheme; and to help pay off gambling debts. These transactions have nothing to do with the fraudulent conduct alleged in Gross's plea agreement. Thus, Lang's alleged harm, if any, is not a result of reliance on the misrepresentations listed in the information. Lang is therefore not a victim of those frauds.") (citing *United States v. Farano*, 749 F.3d 658, 666 (7th Cir. 2014)).

The Downings' motion will be denied.

## V. Howard and Karen Sherline

In April 2015, William Gonte and Brian Benderoff approached Karen Sherline and told her that, since her husband, Howard Sterline, was suffering dementia and no longer could work, an LLC entity would have to be formed to make the remaining premium payments on his life insurance policy. Gonte and Benderoff told Karen that the remaining balance of premiums to be paid was a little more than $500,000. They represented to her that they would make the payments and she would not have to, but they told Karen that she would have to execute a promissory note so it would appear that they had loaned her the money to cover the premiums.

The LLC entity was set up in April 2015. In January 2016, Gonte and Benderoff contacted Karen Sherline again and told her that the promissory note was "not sufficient," and that she would have to pay them $500,000 to cover the premiums. However, they assured her that the money would be returned within a few days after it was paid. Gonte and Benderoff told Karen that if she did not advance the funds, then the policy would lapse and any benefits from it would be lost. On January 22, 2016, Karen Sherline transferred funds from her bank account to Gonte and Benderoff, in return for a promissory note executed by them. Defendant Gross drafted and notarized that promissory note. Gonte also gave Karen a check for the amount of the "loan," which he told her she could cash "in a few days." However, on the date when she was supposed to cash the check, Gonte called her and told her not to deposit the checks because there were not enough funds in his account to cover it. Gonte later made two payments of $50,000 and $25,000 on the supposed loan, but never repaid the remaining balance of more than $425,000.

The specific transaction that the Sherlines mention in their motion bears some obvious but oblique relation to the conveyance of an interest in the viatical LLC entity that was described in the Rule 11 plea agreement. However, as to the specific transaction involving the Sherlines and Gonte and Benderoff, the movants have not identified any misrepresentation made by Gross on which they relied to their detriment. The representations that they describe all were made by Gonte and Benderoff, not by Gross. And the representations made by Gross that were admitted in the Rule 11 agreement involved the execution and notarization of a conveyance of an interest in the LLC, which was presented to secure a loan made by Titan Funding, not by the Sherlines. There is some circumstantial overlap in the scenarios described by Gross in his plea agreement and recited by the Sherlines in their motion, but the Sherlines have not identified any

misrepresentation made in the course of the crimes of conviction that led to their loss. In fact, they do not identify any representations at all that were made by Gross directly to them.

The Sherlines' motion will be denied.

VI. Conclusion

Because there is no convincing evidentiary support for a finding that crime victim status ought to be ascribed to Titan Funding, LLC and Titan Loan Servicing, LLC, Nena and Mark Downing, or Howard and Karen Sherline entitling them to restitution for the crime admitted by Robert Gross, their motions for restitution under the Crime Victim Rights Act will be denied. Because B&W Real Property Associates, LLC has made the requisite showing, its motion will be granted.

Accordingly, it is **ORDERED** that the motions for recognition as a crime victim and for restitution by Titan Funding, LLC and Titan Loan Servicing, LLC (R. 3, No. 18-50729), Nena and Mark Downing (R. 3, No. 18-50827), and Howard and Karen Sherline (R. 1, No. 18-50844) are **DENIED**.

It is further **ORDERED** that the motion for recognition as a crime victim and for restitution by B&W Real Property Associates, LLC (R. 3, No. 18-50728) for recognition as a crime victim and for restitution is **GRANTED**. B&W must present to the government and defendant Gross substantiation of its claimed loss amount **on or before September 28, 2018**.

s/David M. Lawson<br>
DAVID M. LAWSON<br>
United States District Judge

Date: September 26, 2018

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first-class U.S. mail on September 26, 2018.

        s/Susan K. Pinkowski
        SUSAN K. PINKOWSKI